UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LONDON DIVISION
CIVIL ACTION  NO. 04-599-JBJ

Eastern District of Kentucky
F I L E D

MAR 3 0 2006

AT LONDON
LESLIE G. WHITMER
CLERK U.S. DISTRICT COURT

CM & S, INC.,                                                    PLAINTIFF

VS.                      **MEMORANDUM AND ORDER**

CARLOS MAGGARD,                                           DEFENDANT

**\* \* \* \* \* \* \***

This matter is before the Court upon cross-motions for summary judgment
(DE#8, 18).  Having fully considered the record, including the motions, exhibits,
transcripts of depositions, and related filings (DE#10, 12, 19-22), the undersigned
Magistrate Judge denies summary judgment for the following reasons:

Summary judgment may properly be granted pursuant to Fed. Rule Civ. P.
56(c) when the pleadings, depositions, answers to interrogatories, admissions on
file, and affidavits demonstrate that there is no genuine issue as to any material
fact, and thus, upon the established facts, the moving party is entitled to judgment
as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248, 106
S.Ct. 2505, 91 L.Ed.2d 202 (1986). The movant bears the burden of clearly
establishing the lack of any triable issue of fact by the record properly before the
court, and supporting evidentiary material must be construed most favorably to the
non-moving party. *Celotex Corp. v. Catrett*, 477 U.S 317, 106 S.Ct. 2548, 91
L.Ed.2d 265 (1986); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475
U.S. 572, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

When reviewing cross-motions for summary judgment, the court must
evaluate each motion on its own merits and view all facts and inferences in the
light most favorable to the nonmoving party. *Taft Broadcasting Co. v. United
States,* 929 F.2d 240, 248 (6th Cir. 1991); *B.F. Goodrich Co. v. U.S. Filter Corp.*,
245 F.3d 587, 592 (6th Cir. 2001). The standard for evaluating such motions does
not change simply because the parties present cross-motions. *Taft*, 929 F.2d at
248.  "[T]he making of such inherently contradictory claims does not constitute an
agreement that if one is rejected the other is necessarily justified or that the losing

party waives judicial consideration and determination whether genuine issues of material fact exist." *Taft*, 929 F.2d at 248; *B.F. Goodrich*, 245 F.3d at 593; *Parks v. LaFace Records*, 329 F.3d 437, 444-445 (6th Cir.), *cert. denied*, 540 U.S. 1074 (2003).

"A federal court sitting in diversity applies the substantive law of the state in which it sits." *Hayes v. Equitable Energy Resources Co.*, 266 F.3d 560, 566 (6th Cir. 2001); *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Westfield Ins. Co. v. Tech Dry, Inc.*, 336 F.3d 503, 506 (6th Cir. 2003); 28 U.S.C. §1332. Under Kentucky law, in the event of nonpayment of royalties, a lease permits an unpaid lessor to seek recovery of a deficiency. *Hayes*, 266 F.3d at 567; *Kelley v. Ivyton Oil & Gas Co.,* 204 Ky. 804, 265 S.W. 309, 311 (Ky.Ct. App. 1924).

Both parties in the present case claim breach of contract by the other. Plaintiff alleges that defendant breached the contract by not paying him royalties when defendant's company "MMI" began mining coal under its own permit in 2000. Defendant alleges that plaintiff breached the contract from its inception in 1997 by fraudulently attempting to assign non-existent rights under an expired, non-renewable permit. In *Dalton v. Mullins*, 293 S.W.2d 470, 476 (Ky. 1956), the Kentucky Supreme Court held that "...the party first guilty of a breach of contract cannot complain if the other party thereafter refuses to perform," citing Am.Jur., Vol. 12 Contracts, §338. "[N]o benefits should be obtained by the party who is guilty of the first breach." *Dalton*, 293 S.W.2d at 476 (holding that defendant "had the right to treat this action as a breach, to abandon the contract, and to depart from further performance on his own part and finally demand damages"). Am.Jur., Vol. 12 Contracts, § 389; see also, *Anvil Mining Co. v. Humble*, 153 U.S. 540, 14 S.Ct. 876, 38 L.Ed. 814.

In *Papa John's Intern., Inc. v. Specktacular Pizza, Inc.*, 2005 WL 3132337, *4 (W.D. Ky. 2005), the Court pointed out that "[u]nder basic contract principles in Kentucky, when one party to a contract feels that the other contracting party has breached its agreement, the non-breaching party may respond to the other party's breach in one of two ways: (1) either stop performance and assume the contract is ended; or (2) continue performance and sue for damages," *citing Dalton*, 293 S.W.2d 470 (Ky.1956) and *Meador v. Robinson*, 263 S.W.2d 118, 118 (Ky. 1953).

Plaintiff seeks to enforce the contract to obtain royalties, whereas defendant essentially asserts that the contract is void for lack of consideration. Where there is a substantial failure of consideration, rescission may be an appropriate remedy. The party seeking rescission must show he or she is free from fault and return any

benefits already received under the contract. See *O. P. Link Handle Co. v. Wright*, 429 S.W.2d 842, 845 (Ky. 1968); *Jones v. White Sulphur Springs Farm, Inc.*, 605 S.W.2d 38, 43 (Ky. Ct. App. 1980); *Shmidt v. Schmidt*, 343 S.W.2d 817, 819 (Ky. 1961). In addition, "parties may substitute one contract for another, thereby discharging the pre-existing duty of the obligee and extinguishing the obligor's right to enforce the original duty". *Ashland Sales and Service Co. v. Dysard*, 145 F.3d 1329, 1998 WL 279364, *4 (6th Cir. 1998). Kentucky courts also recognize the doctrine of unjust enrichment. See *Curtis v. Campbell,* 336 S.W.2d 355 (Ky. 1960); *Dalton*, 293 S.W.2d 470; *Sexton v. Integon Indem. Corp.*, 798 F.2d 1416, 1986 WL 17333, *3 (6th Cir. (Ky.)).

Defendant alleges that plaintiff fraudulently attempted to transfer non-existent mining rights under a permit that was expired and non-renewable. "It has long been the law in Kentucky that where the parties put their agreement in writing, all prior negotiations and agreements are merged in the instrument, and each is bound by its terms unless his signature is obtained by fraud or the contract be reformed on the grounds of fraud or mutual mistake..." *Jones*, 605 S.W.2d at 42; *Childers & Venters, Inc. v. Soward*, Ky., 460 S.W.2d 343 (1970); *Joseph v. Shamrock Coal Co., Inc.*, 125 F.3d 855, 1997 WL 618797, *3 (6th Cir. 1997) (discussing state law claims of fraud, lost royalties, and breach of contract in connection with a lease agreement to mine coal on plaintiff's property).

## Facts and Allegations

In 1983, Plaintiff CM & S, Inc. ("CMS") leased a tract of land from the "Taylor heirs", and after obtaining Kentucky Mining Permit #848-0052 in 1985, strip-mined coal on that tract of land.[1] The permit expired ten years later in 1995, after which no coal could be mined from the property. Smith acknowledged at his deposition that no mining could occur at the site after the permit expired. Smith Depo., p. 21. However, CMS was still responsible for reclaiming the highwalls left on the site. See Deposition of Allen Luttrell, Director of Permitting for the State of

---

[1]At his deposition, Clifford Smith indicated that he and Royce Moore had initially leased the land from the "Taylor heirs", and that he then bought out Moore's interest and assigned the lease rights to his company, CM & S, Inc. See Smith Deposition, p. 39-40. CM & S, Inc. later assigned the rights in the land to Carlos Maggard in 1997. Smith asserts that he is "1/6 of the Taylor heirs". Smith Depo., p. 25, 34-35. Similarly, Maggard indicated at his deposition that Smith had bought out two of the Taylor heirs. Maggard Depo., p. 25.

Kentucky, p. 8-12. CMS, through its sole owner Clifford Smith, sought to renew
the permit.  However, CMS failed to cure various deficiencies in its application for
renewal, despite multiple written notices from state mining authorities. The
renewal request was denied on October 18, 1996, and a subsequent request for
reconsideration by CMS was rejected as untimely.[2] See Luttrell Deposition, p. 8-
12. Smith acknowledged at his deposition that he could not continue mining
unless he settled existing fines on the permit and asserted that, if he had resolved
all his fines, he could have gotten the renewal of his permit. Smith Depo., p. 24,
29-30. At the time, CMS and/or Smith were subject to a number of state citations
and some large penalties for non-compliance with reclamation obligations.

Clifford Smith then negotiated with Carlos Maggard ("Maggard"), who
wished to conduct underground deep-mining at "Increment 4" of the permitted
site. In his affidavit, at DE#8, ¶2-3, Carlos Maggard indicates that:

> "In 1997, I began negotiating with Clifford Smith regarding a proposed
> underground mining operation located in Harlan County, Kentucky, on real
> property owned by the Taylor heirs." Mr. Smith represented to me that he
> held a current, valid Kentucky mining permit that included the rights to
> develop and operate an underground mine in the Upper and Lower Hance
> seams of coal on this property."

CMS and Maggard entered into a contract on March 6, 1997, by which CMS
assigned "all rights" under the mining permit and the leasehold rights for the mine
site to Maggard in exchange for Maggard's agreement to re-permit and re-bond
the site, to pay CMS  royalty payments of $1.00 for each ton of coal mined at that
location, and to assume reclamation obligations at Increment 4.  Specifically, the
assignment contract set forth the following terms:

> 1. Assignor is the holder of Kentucky Mining Permit #848-0052, which
> includes, as Increment #4, the rights to develop and operate an underground
> mine in the Upper and Lower Hance seams of coal.

> 2) Assignor does hereby assign to Assignee all of Assignor's rights under
> said Increment #4. Assignee shall hereafter be responsible for all

---

[2]The record shows at least three letters from mining authorities in 1995-96 indicating that
CMS needed to cure deficiencies in its renewal application. CMS did not do so.

reclamation obligations related to Increment #4.

3) Assignee shall take immediate steps to re-permit and re-bond the area presently included within said Increment #4, and agrees to use its best, reasonable efforts in pursuing same.

4) As consideration for this assignment, Assignee agrees to pay Assignor the sum of $1.00 for each ton of coal mined from Increment #4 of Permit #848-0052, or its successor.

5) Assignor also owns leasehold rights to the permitted property by reason of an October 10, 1983 Lease from the real property owners and has, on even date herewith, subleased these rights to Assignee. This Sublease is incorporated herein by reference.

The "Sublease" (see DE#10, Exh. 1) from CMS, Inc. (Sublessor) to Carlos Maggard (Sublessee), is dated March 6, 1997 and sets forth that:

"WHEREAS, Sublessor is the holder of certain leasehold rights by reason of an October 10, 1983 Lease from Mildred Taylor Jacobs, et al, of record in Lease Book 29, Page 93, Harlan County Court Clerk's Office, to which reference is made for a more particular description of the real property and the rights and obligations contained therein;

WHEREAS, Sublessor desires to Sublease a portion of said leasehold rights to Sublessee in accordance with the terms and provisions below;

NOW THEREFORE, in consideration of the premises, and the mutual covenants and undertakings set forth below, Sublessor does hereby sublease and sublet unto Sublessee the above-described leasehold rights of Sublessor, subject to the terms and provisions set forth below;

1.   The leasehold rights herein conveyed are limited to the Upper and Lower Hance seams of coal located on Mill Creek, Harlan County, and which can be recovered by the underground method of mining, along with all additional rights of Sublessor that are necessary and convenient for Sublessee to enjoy the rights herein conveyed and to fully and completely mine and recover said seams of coal.

2. Sublessor also owns Kentucky Mining Permit #848-0052, which includes and encompasses the real property herein conveyed, and by

separate agreement, will assign to Sublessee those permit rights.

3. Sublessee agrees to pay the Lease royalty of 10% of the gross selling price or $2.50 per ton of coal mined or removed from the premises, whichever is greater at the time of sale. Sublessor will provide Sublessee with the name and address of the person or entity to receive the royalty payments.

4. This Sublease shall extend until all of the mineable and merchantable coal has been removed from the premises herein conveyed.

5. Sublessor agrees to comply with all of its remaining obligations as Lessee under the October 10, 1983 Lease, to ensure that said Lease remains in force and effect so as to protect and preserve the rights of Sublessee herein.

6. Sublessee is an independent contractor, and in no event shall Sublessee be deemed the employee of Sublessor.

However, at the time, CMS did not have a "current valid permit" and had no rights to mine coal at Increment 4. The permit had expired in August of 1995, and the renewal request had been denied in October of 1996. The permit still existed, but only for purposes of enforcement of reclamation obligations. In fact, the CMS permit (#848-0052), at p. 3, ¶15, expressly indicates on its face that it does not operate as a waiver of the agreed order in *NREPC v. Clifford Smith and C.M. & S., Inc.*, File No. PHS-16704-73-II, and the consent judgment in *NREPC v. Clifford Smith d/b/a C.M. & S., Inc. and C.M. & S., Inc.*, civil action no. 90-CI-01794. The permit, at p. 3, ¶17, provides that "the validity of this permit is expressly conditioned upon the permittee's strict compliance with the terms and conditions" of the judgments in such enforcement actions.

State mining inspectors visited the mine, and on March 31, 1997, issued an additional citation to CMS for non-compliance with pre-existing reclamation obligations. A previous inspection report dated 12-30-96 had given CMS 30 days to begin reclamation. Thus, at the time of its contract and assignment in 1997, CMS was not in compliance with its reclamation obligations. Smith acknowledged at his deposition that Maggard could not legally mine coal at the site under CMS permit "until all the fines and penalties were resolved". Smith Depo., p. 30-31. Smith stated that he ultimately settled the fines for $86,000.00, which was 10% of the $860,000.00 in fines.

Maggard, who indicates that he had believed that he could immediately begin deep mining at the site under the CMS permit, had arranged for heavy

equipment to begin work. Maggard Depo., p. 15-16. However, he was informed by a mining inspector at the site that such permit was expired and that he could not engage in any coal mining activities at that location. Maggard Depo., p. 9. Of course, the contract required Maggard to "re-permit".

Disputed issues of contractual intent are factual issues not to be resolved at summary judgment. *See United States v. Cello-Foil Prods., Inc.,* 100 F.3d 1227, 1234 (6th Cir. 1996)(reversing summary judgment and holding that "issues regarding parties' intent, with respect to agreements or contracts, present interpretative issues traditionally understood to be for the trier of fact"); *Ingram v. City of Columbus,* 185 F.3d 579, 586 (6th Cir. 1999)(reversing summary judgment and holding that when there is evidence favoring both sides "neither the district court nor this Court may make credibility determinations or weigh the evidence"); *Talley v. Bravo Pitino Restaurant, Ltd.,* 61 F.3d 1241, 1245 (6th Cir. 1995) (reversing summary judgment and observing that "the role of the judge at the summary judgment stage is not to weigh the evidence").

Director Luttrell explained at his deposition that "re-permitting" is substantially less cumbersome than obtaining a completely new permit. Luttrell Depo., p. 25. However, the expired CMS permit was no longer renewable at the time of the contract with Maggard. Director Luttrell explained that at that point, if a third party came in, such entity would have to obtain a new permit from scratch. See Luttrell Depo., p. 16-17. Director Luttrell explained that reclamation obligations could be transferred, but that there are state law requirements for doing so. Luttrell Depo., p. 24, 28. The record does not indicate whether this contract met such requirements. Although Maggard did not actually receive any mining rights under the expired permit, there is also the question of whether he actually received the assigned right of entry and used it to obtain a new permit.

Maggard formed a corporation, Maggard Mining, Inc. ("MMI") and went through the lengthy process of applying for a new permit "from scratch". In April of 2000, MMI obtained a new permit to deep mine for coal at Increment 4. As representative of MMI, Maggard signed a "Statement of Liability for Overlapped Areas", see DE#10, Exh. 9, which indicated that:

"Maggard Mining, Inc. expressly agrees to assume liability, immediately, upon issuance of Permit #848-538, for reclamation of all areas included within the permit area of Permit #848-538, including any areas previously disturbed by C.M. & S., Inc. Reclamation of areas disturbed prior to issuance of Permit #848-538 shall proceed according to the schedule set

Page 7 of 9

forth in Attachment 12.2A of this application."

MMI filed a new surety bond to guarantee reclamation of the entire permit area of Permit #848-538, "whether disturbed in connection with Permit #848-538 or previously disturbed in connection with Permit #848-0052." See DE#10, Exh. 9.[3]

According to Maggard, MMI leased the mine site directly from the Taylor heirs because Smith owed the Taylor heirs between 100,000 and 135,000 dollars. Maggard Depo., p. 24. Maggard stated at his deposition that he pays the Taylor heirs $2.50 per ton of cleaned coal under that lease agreement, and that Smith bought out two of the heirs. Maggard Depo., p. 24-25. Clifford Smith acknowledges that he is "1/6 of the Taylor heirs". Smith Depo., p. 25, 34-35. Maggard said the royalties are paid and referred to an order of the "Harlan Court", which apparently had issued a judgment for the other Taylor heirs against Smith in August of 2005. Maggard Depo., p. 26. With respect to plaintiff's claim that 418,000 tons were mined, Maggard asserts that 225,624 tons of coal were actually mined in the vicinity, but that some of it was for two other entities and not all was attributable to Increment 4. Maggard Depo., p. 27, 30-31.

Plaintiff contends that only "some" of the heirs signed a new lease with Maggard and questions the validity of such new lease. The parties have not submitted any documentation of the new lease, any pertinent orders from the bankruptcy court, a copy of the judgment against Smith in favor of the Taylor heirs, or any other legal documents that might shed light on the related leasing and royalty arrangements. Smith himself stated at his deposition that the judge in his divorce proceeding had ordered Smith's royalties to be paid to his wife, and that the Taylor heirs had sued him and obtained a judgment against him. As such matters may be relevant to the present action, and as genuine issues of material fact remain, summary judgment would not be appropriate at this time.

Given the factual disputes discussed herein, the undersigned Magistrate Judge in not persuaded that the present record before the Court clearly establishes that "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of

---

[3]CMS had posted a bond for its permit in the total amount of $142,700.00 (with $43,200.00 of that amount being attributable to Increment Four). See DE#10, Exh. 2, Hearing Officer's Report on March 3, 1999, and attached permit. On April 5, 1999, the CMS bond was forfeited, and the CMS permit was finally "revoked" as a result of state enforcement action. See DE#10, Exh. 3, Order; and see, "HO report" dated 3-3-99.

law." Fed.R.Civ.P. 56(c). As the Sixth Circuit Court of Appeals observed in *S. J. Groves*, 315 F.2d 235, 237 (6th Cir.), *cert. denied*, 375 U.S. 824 (1963):

> "This Court has on several occasions expressed the view that a trial judge should be slow in disposing of a case of any complexity on a motion for summary judgment, that while such a judgment wisely used is a praiseworthy and timesaving device, yet such prompt dispatch of judicial business is neither the sole nor the primary purpose for which courts have been established, and that a party should not be deprived of an adequate opportunity to fully develop his case by witnesses and a trial, when the issues involved make such procedure the appropriate one."

Accordingly,

   It is **ORDERED** that:

a) the "Motion for Summary Judgment" (DE#8), as renewed (DE#18) by defendant is **DENIED**; and
b) the "Motion for Summary Judgment" (DE#19) by plaintiff is **DENIED**; and
c) a separate order setting this matter for trial will be issued.

This the ___30th___ day of March, 2006.



Signed By:
J. B. Johnson, Jr.
United States Magistrate Judge